**J. M. HAYS WOOD PRODUCTS COMPANY, Respondent, v. SIMMONS SADDLERY COMPANY, Appellant.**

St. Louis Court of Appeals. Opinion Modified and Filed October 2, 1923.

1. **APPEALS: Nonsuits: Counterclaims: Peremptory Instruction Directing Verdict Against Defendant on Counterclaim: Final Judgment: Appealable.** In an action to recover a balance of an account for saddlery goods bought by defendant from plaintiff in which the defendant filed a counterclaim, judgment setting out *in haec verba* the peremptory instruction given at the instance of plaintiff directing a verdict against defendant and in favor of the plaintiff on the counterclaim, adjudges defendant's counterclaim against the defendant by dismissing the counterclaim and giving judgment for plaintiff for the amount sued for in the petition, and assessing the costs of the suit against the defendant, *held* the judgment is sufficient and that an appeal lies from such judgment.

2. **DAMAGES: Special Damages: Breach of Contract: Rule as to Recovery.** Where a party breaches a contract, in order to hold such party for special damages, the law requires notice of special circumstances as might occasion unusual damages to be brought home to the party breaching the contract, and such knowledge, if brought to the attention of the contracting party is sufficient to warn such party of the special peril which might attend the failure to meet the terms of the contract, and it is not necessary that a statement of such circumstances be contained in the formal

Hays Wood Products' Co. v. Simmons Saddlery Co.

contract itself; the special damages must be one which the party breaching the contract from his knowledge of the facts and circumstances, must be held to have anticipated as a natural result of its breach of the contract.

3. **SALES: Breach of Contract: Damages: Vendee's Contract With Third Party: Vendor Without Notice: Not Liable for Damages Vendee Paid Pursuant to Contract.** Where defendant by its counterclaim sought to recover special damages from the plaintiff growing out of a breach of contract in that plaintiff failed to deliver saddletrees, etc., and the record discloses no evidence tending to show that plaintiff knew, either actually or constructively, that there was a penalty clause or clause for liquidated damages in defendant's contract with the Government for resale of the saddlery, nor was it in any manner brought home to the plaintiff at the time the contract between plaintiff and defendant was entered into that defendant was required in its contract with the Government under penalty to complete the saddles on a definite date, and such special damages not being of a character naturally and proximately resulting from such breach, *held* the ruling of the trial court in giving a premptory instruction and directing a verdict against the defendant and in favor of the plaintiff on defendant's counterclaim was correct.

4. ———: ———: ———: **Customs: Damage Clause in Vendee's Government Contracts: Knowledge of Date of Delivery: Not Brought Home to Vendor: No Liability.** The vendor of saddlery, on breach of contract to deliver, *held* not liable for liquidated damages vendee was required to pay the United States Government under its contract of resale with the Government containing a clause for liquidated damages payable on failure to deliver the saddlery within a certain date (such contract being made in the name of vendee's sales agent), where no knowledge that such a contract with the Government requiring delivery before a certain date was brought home to vendor; the custom of including in Government contracts a provision for liquidated damages in case of delay not sufficing to create liability, when the date for completion could not in the very nature of things be made known to vendor by the law of custom.

Appeal from the Circuit Court of the City of St. Louis. —*Hon. Robert W. Hall,* Judge.

AFFIRMED.

*Smith & Pearcy* for appellant.

(1)  A.  Where a party sustains a loss by reason of a breach of contract, he shall, so far as money can do it, be placed in as good a situation by recovery of damages as if the contract had been performed.  Hadley v. Baxendale, 9 Ex. 341; Shouse v. Neiswanger, 18 Mo. App. 236.  Where a party who subsequently breaks a contract, at the time of entering into the contract had notice of the existing facts out of which special damages would naturally arise to the other party by a breach, the party so breaking the contract will be held liable for such special damages which naturally and proximately result from such breach.  Hadley v. Baxendale, 9 Ex. 341; Morrow v. Railroad, 140 Mo. App. 200; Peoria v. Bain Mfg. Co., 76 Mo. App. 76, 83.  B.  Where a contract providing for the sale of goods which are not procurable in the general market is broken, the injured party is entitled to recover such special damages as may reasonably and fairly be considered to be within the contemplation of the parties at the time the contract was entered into.  Weber Implement Co. v. Acme Harvesting Machine Co., 268 Mo. 363.  (2)  A.  The notice which the law requires in order to hold a party breaking a contract for special damages, is a knowledge of the special circumstances attending the execution of the contract.  Knowledge of such special circumstances as might occasion unusual damages, if brought home in any manner at the time of entering into the contract, is sufficient to warn parties thereto of the special peril which might attend the failure to keep the engagements provided by the contract.  It is of no importance that a statement of the circumstances was not contained in the written, formal contract itself.  Wall v. Ice Co., 112 Mo. App. 659; Iowa Manufacturing Co. v. Sturtevant, 162 Fed. 460; Weber Implement Co. v. Acme Harvesting Machine Co., 268 Mo. 363; Chalice v. Witte, 81 Mo. App. 84.  B.  Such notice may be constructive as well as actual.  Facts which would put a person upon inquiry will be evidence from which the inference may be drawn that a party did have notice.  Barrett v. Davis,

104 Mo. 549; Van Raalte v. Harrington, 101 Mo. 602; Morrow v. Railroad, 140 Mo. App. 200; Shouse v. Neiswanger, 18 Mo. App. 236; Hedden v. Schneblin, 126 Mo. App. 479; Harper Furniture Co. v. So. Exp. Co., 148 N. C. 87; Grand Prairie Gravel Co. v. Joe B. Wills Co., 188 S. W. 680; Howard v. Wells, 176 Fed. 512; Hagen v. Rawle, 143 Ill. App. 543. (3) A. Loss of profits is properly recoverable as special damages where the party breaking the contract has such notice of the special circumstances of the case that it may be reasonably inferred that the loss of profits was within the contemplation of the parties as an element of damages, at the time the contract was entered into. Wakeman v. Wheeler, etc., Co., 101 N. Y. 205; Joplin Water Co. v. Bathe, 41 Mo. App. 285; Mo. Pac. R. Co. v. Peru-VanZandt Co., 85 Pac. 408. B. The fact the amount of such loss or the terms of the injured party's engagements, under which such loss of profits arises, were not known to the party who subsequently breaks the contract, does not change the rule, if the defaulting party knows the special circumstances of the case. Hamer v. Schoenfelder, 47 Wis. 455; Builders' Sup. etc. Corp. v. Gadd, 111 S. E. 771; Mackey v. Boswell, 162 Pac. 193; Elzy v. Express Co., 141 Iowa, 407; Peterman v. Goss, 160 Pac. 432; Simpson v. London & N. W. R. Co. (Q. B. D.), 24 W. R. 294. (4) The rule that loss of profits constitutes a legitimate element of special damages is enforced with full vigor in cases where such loss of profits results from penalties or liquidated damages to which the injured party may be subjected by reason of the breach committed by the other party to the contract. Iowa Mfg. Co. v. Sturtevant Mfg. Co., 162 Fed. 460; I. C. C. R. Co. v. Cobb Christy Co., 64 Ill. 128. The fact that the amount of the penalty as liquidated damages is not known to the wrongdoer is no defense if the wrongdoer knows the special circumstances out of which the loss arises. Die Elbinger & Co. v. Armstrong, 9 Q. B. (L. R.) 473; Booth v. Spuyton Duyvil Rolling Mill Co., 60 N. Y. 487; Czarnikow v. Baxter, 130 N. Y. Supp. 617; Murdock v. Jones, 38 N. Y. Supp. 461; Meyer v. Haven, 75 N. Y. Supp. 261; Beeman

v. Banta, 118 N. Y. 538; Carroll & Co. v. Columbus & Co., 55 Fed. 451; N. W. & Co. v. Great Lakes, etc., Wks., 181 Fed. 39; Hecla Powder Co. v. Sigua Iron Co., 157 N. Y. 437; Friedgood v. Kline, 123 N. Y. Supp. 247; Neal v. Heyman & Co., 122 N. C. 104; Industrial Wks. v. Mitchell, 114 Mich. 30; Messmore v. N. Y. Shot & Lead Co., 40 N. Y. 422; Grindell v. Eastern Express, 67 Me. 317. (5) Simmons was not prejudiced by aiding Hays. Mueller v. Nat'l & Co., 243 S. W. 420. (6) The Rock Island contract, Rock Island telegrams and correspondence with reference to rate of shipment and other evidence tending to show the special circumstances of the case were improperly excluded. (7) All reasonable inferences will be indulged in favor of the sufficiency of the evidence adduced, and such evidence will be taken as true in ruling upon a demurrer to the evidence. Baird v. Railway Co., 146 Mo. 265; Mallott v. Railway, 199 Mo. App. 615; Brisco v. C. & A. R. R. Co., 200 Mo. App. 691; Maginnis v. Railroad Co., 268 Mo. 667.

*Irwin & Haley* and *Ernest Green* for respondent.

(1) Plaintiffs' demand was acknowledged as correct. Defendant took an involuntary nonsuit. The appeal is taken from the order overruling defendant's motion for a new trial and to set aside its involuntary nonsuit upon its counterclaim. Under such circumstances no appeal will lie as no judgment was rendered in favor of the plaintiff on the counterclaim. Bonanomi v. Purcell et al. 230 S. W. 120; Boggess v. Case, 48 Mo. 278; Lyons v. Rollins, 109 Mo. App. 68; Conn v. Ferree, 60 Mo. 17; Sterling v. Stubblefield, 83 Mo. App. 266; Boyles v. Pioneer Coop. Co., 208 S. W. 122; Lowe v. Freed, 258 Mo. 208; Freeman v. McCrite, 165 Mo. App. 1; Rock Island v. Marr, 168 Mo. 252. (2) In order to make a custom a fixed element of a contract, it must be certain, settled, uniform, notorious and known to the parties, or so universal in character that knowledge may be presumed. Martin v. Hall, 26 Mo. 386; Freight v. Cotton

Press Co., 44 Mo. 71; Johnston v. Parrott, 92 Mo. App. 199; Elrich v. Life Ins. Co., 103 Mo. 231; Shields v. Suburban Ry., 87 Mo. App. 637. (3) A party may recover only such damages as may fairly and reasonably be considered either as arising naturally according to the usual course of things, from a breach of the contract itself or such as may reasonably be supposed to have been in contemplation of both parties at the time they made the contract as the probable result of the breach of it. Fitch v. Telegraph Co., 150 Mo. App. 159; Melson v. W. U. Tel. Co., 72 Mo. 111; Abeles v. W. U. Tel. Co., 37 Mo. App. 554; Hughes v. W. U. Tel. Co., 79 Mo. App. 133; Primrose v. Telegraph Co., 154 U. S. 1; Glove Refining Co. v. Oil Co., 190 U. S. 544; Freeman v. Dempsey, 41 Ill. 554; Williams v. Case, 79 Ill. 356; Wendell v. Walker, 87 N. Y. 142; Booth v. Sperytan, 60 N. Y. 487; Union Foundry v. Columbia, 112 Ill. App. 183; Cobb v. I. C. Railway, 64 Ill. 128. (4) When a contract provides for special damages, or is of a special character and there is a breach caused by the failure to comply with another contract, which is ancillary thereto, that in order to recover such special damages in a suit for the breach of the subordinate contract, the maker thereof must have notice of the character of such principal contract. Olmstead v. Burke, 25 Ill. 86; Hadleys et al. v. Basendale, 26 Eng. L. & E. 398; W. St. L. R. R. Co. v. Lynch, 12 Ill. A. 365; C. B. & Q. Ry. Co. v. Hale, 83 Ill. 360. (5) The mere fact that the Hays Woods Products Company knew the purpose for which the saddletrees were to be used is not sufficient, but it must have accepted the contract with the special conditions attached to it. Globe Refining Co. v. Cotton Oil Co., 190 U. S. 544; Benjamin on Sales, (6 Am. Ed.), 872.

DAUES, J.—This is an action to recover a balance of $3507.58 for saddlery goods bought by defendant from plaintiff. The petition is in usual form, containing the itemized account. Defendant by answer admitted plaintiff's account set out in the petition but sets up a count-

erclaim for $3219.12 as special damages, alleging that plaintiff breached a contract made with defendant on April 30, 1917, in failing to deliver to defendant certain goods on or before October 1, 1917.

Plaintiff's reply is a general denial; the answer to the counterclaim is a general denial, and there is a special denial of the execution of the contract as pleaded by defendant. The case proceeded as if a general denial had been filed to the answer to the counterclaim.

The cause was tried to the court and jury. At the close of defendant's case on the counterclaim, the court gave a peremptory instruction for plaintiff on its petition and a peremptory instruction for plaintiff on defendant's counterclaim. Judgment followed, and defendant appeals.

The record contains 400 printed pages, with eighty-eight exhibits. Same is summarized as follows: Plaintiff is in the saddletree business in Jefferson City, Missouri, and at the beginning of this controversy operated under the name of J. S. Sullivan Saddle Tree Company. The defendant was at the time engaged in the saddlery business in the city of St. Louis, and was affiliated with the Simmons Hardware Company which acted as sales agent for the defendant, and both of these companies were operated under The Associated Simmons Hardware Companies, a common-law trust.

On April 9, 1917, defendant wrote plaintiff asking for quotation of price and delivery on mule riding saddletrees, model of 1913, to comply with Rock Island specifications. Two days prior the defendant also had received an advertising circular from the government Arsenal at Rock Island, Illinois, calling for bids on 5,670 mule riding saddles. This circular, known as Circular 1440, was dated April 6, 1917, and called for proposals to be taken at Rock Island up until 2 P. M. April 23, 1917. Circular No. 1440 contained a specification that the contract on such bids was to provide for a delivery date and that the contractor would be penalized a named percent as liquidated damages for every day the con-

Hays Wood Products Co. v. Simmons Saddlery Co.

tractor failed in the delivery of the goods beyond the date fixed in the contract.

On April 10th plaintiff replied to defendant's letter of the 9th, as follows:

"We cannot give you a price on this mule riding saddle tree until we ascertain whether we can obtain the material and at what price. We are making every possible inquiry. Would you care to have us send you one of the trees as soon as made?"

However, on April 12th, plaintiff sent a letter to defendant quoting a price on several commodities; the first on the list was Wild West tree $5, and among the other items was a mule tree with brass horn at $6.25, the letter concluding with the paragraph: "Can begin deliveries of the Wild West tree in thirty days from receipt of order, and deliver 100 trees per day." This letter, it seems, was in the form of a circular letter to all the trade quoting these prices. By return mail defendant wrote plaintiff: "We are basing our figures on your quotation on saddletrees and expect to place the order with you in the event that we are one of the successful bidders."

On April 24th defendant wired plaintiff asking when the first of the saddletrees would be delivered. On the next day, confirming a telephone conversation, plaintiff wrote defendant that it could commence the delivery of mule trees in about sixty days and deliver same at the rate of 100 trees a day. In this letter the price was fixed at $6.25 each, net, f. o. b. St. Louis. Defendant offered to show on the next day it wired the Arsenal that it could commence delivery within sixty days and continue at the rate of 200 saddles per week. Two days later, on April 26th, the government, by letter, advised defendant that it had been awarded the contract for the saddles and that a formal contract would follow.

On April 28th defendant sent plaintiff a blue print received from the government covering the specifications of the saddletree.

On April 30th defendant, by letter, placed its formal

order with plaintiff for 5,670 mule trees, fixing the price at $6.25 each, delivery to begin within thirty days and to be delivered at the rate of 150 per day, bearing notation "Received May 1st, order acknowledged 5 9 4. Factory ship 60 days."

After said order was made and accepted plaintiff repeatedly requested defendant to procure a sample from the Arsenal so it would have a model to work from. It appears that the Arsenal on May 21, 1917, sent a sample saddle to defendant, which, according to the government authorities, was not intended as "meeting the specifications in every respect but is sent for whatever assistance it may be and to give you a general idea of our requirements." A sample saddle also was sent to the defendant, Simmons Company, on June 18th by the Arsenal, and a sample saddle was delivered to plaintiff by the government on April 7th for use to figure bids upon.

On July 17, 1917, defendant wrote plaintiff as follows: "We are just in receipt of word from Rock Island Arsenal that the last sample horn for Mule Riding Saddletrees is correct as to dimension and composition." There was much difficulty in getting horns of the exact composition required by the government. The record discloses that on May 5th plaintiff wrote the Arsenal for a complete saddletree from which it could check the minor details on the blue prints.

J. M. Hays, president of the plaintiff company, called as a witness for defendant, testified that he had been connected with the saddletree plant at Jefferson City for over forty years; that his company had made saddletrees for the government during the Spanish-American war, and that the government at times afterwards ordered goods just as other commercial houses would do; that early in 1917 plaintiff had filled a contract with the government for Samur saddletrees; that he had often gone to the Rock Island Arsenal in March and April, 1917, and that he had discussed with officials there the prospect of receiving government work, but did not dis-

cuss mule saddles until after this matter came up with defendant; also, that after April, 1917, plaintiff had made saddletrees for the government. This witness was asked with reference to his information or knowledge concerning the penalty stipulated in the contract between defendant and the government, and the following questions and answers relate thereto:

"Q. You knew, as a matter of fact, didn't you, Colonel, that the government, in making contracts for supplies, exacted a penalty or damages in the case of failure to comply with the contract, didn't you? A. I don't know what they did with the other people; I know they did not with me.

"Q. Did with you? A. Did not prior to the war; I have got contracts right there, no penalty attached to them.

"Q. Now, you mean to say that you could break a contract with immunity with the government, and there would be no penalty involved? A. You could not break it with immunity; no; it was an open order, practically an open order.

"Q. Where a specified time was fixed for delivery, you mean to say you could go six or eight months beyond that time? A. I did not.

"Q. And the government would acquiesce? A. Well, when no penalty, when they bought in the open market, there was no penalty attached, ship the stuff.

"Q. I beg pardon? A. When they place an order in the open market we manufacture and ship it to them, like we did anybody else; I never had a contract with the Marine Department; I ship United States Government Ordinance Department, Quartermaster; we have no contract whatever, if you want to get down to it; we never had a contract; I knew nothing about your penalty business, and we got into the Ordinance Department from Washington, and I knew nothing about that you people were going to be penalized at all; all I knew was the order came to us.

"Q. Didn't know it at all? A. I didn't know; I

didn't know at that time about the quantity; I don't think you people did.

"Q.  When did you first discover that, Colonel?  A. The first I discovered about it after you told us; I wrote down—

"Q.  That is the first time you knew?  A.  That is the first time I knew.

"Q.  Didn't know anything at all about it?  A.  I didn't know Simmons Saddlery Company had a contract; I didn't know who the contractor was until it was brought up in this trial.  .  .  .

"Q.  You are certain you didn't know about this; you say you didn't know about this penalty until a year after the whole thing was over?  A.  Didn't you people — I knew nothing about your people were penalized; I thought you couldn't pay your bill; I am not certain about Simmons Saddlery Company now, because you never had the contract, Simmons Saddlery Company, with the government.  .  .  .

"Q.  Oh, I know, but you didn't know anything about it until we refused to pay the bill that you rendered and gave as explanation that we felt you owed us $3,219.26, the first time?  A.  I don't know when is the first time, but I did not when I took the order know that you were penalized at all."

Witness testified as to the receipt of a letter of April 7th from a government officer that a mule saddle-tree to be used as a model in making bids had been delivered to Mr. Hampton of the plaintiff company.  Mr. Hampton, plaintiff's business manager, testified that this sample was given to him so they could figure a price on same.  Plaintiff's manager and other agents knew that the saddletrees to be made for defendant were to be used by the government.  Witness Hampton's testimony as to his visits to the Rock Island Arsenal in 1917 is as follows:

"Q.  You made frequent visits this winter and spring of 1917 to the Rock Island Arsenal?  A.  I did.

"Q.  Do you remember being up there about the

first of April? A. I do not remember any dates; the files will show for that.

"Q. Do you remember bringing back a mule saddletree? A. I do.

"Q. I show you a letter dated April 7th, and marked 'Defendant's'— . . .

"Q. Do you remember that? A. Yes, I remember getting it, you mean?

"Q. Do you remember—whom did you get it from?

"Mr. Green: Well, it says —

"A. Gotten from Colonel Burr.

"Mr. Smith (Q.): From Colonel Burr; did you discuss the matter with Colonel Burr? A. Asked for the tree, evidently—wouldn't have gotten it.

"Q. Discuss it with anybody else? A. Why, I possibly discussed it with the man that got it for me, who was in charge of the woodworking department at the time.

"Q. Who was that? A. Lieutenant Baxter.

"Q. Did you discuss the proposition of bids coming out? A. No, no.

"Q. How did you happen to get this mule tree, Mr. Hampton? A. Because we wanted it to look at it, so we could figure on the tree.

"Q. Well, this letter mentions it is for use in connection with the bids to be opened for mule riding saddles. A. No, we were not bidding on them.

"Q. I know, but you knew, did you not, that bids were to be called for for mule riding saddles? A. Possibly so; we knew lots of things were going to be called for. . . .

"Q. Well, this circular 1440 bears date April 6, 1917? A. I don't know anything about the circular at all.

"Q. That was the date before this letter was sent? A. I don't know anything about the circular at all.

"Q. What day were you in Rock Island? A. I don't know.

"Q. Prior to April 7th? A. I don't know; I don't remember the date at all.

"Q. Well, this— A. I must have been there at that time.

"Q. Yes, sir. A. I must have been."

There is evidence of a letter from Colonel Burr to plaintiff, dated April 7, 1917, to the effect that a sample tree had been delivered to Hampton to be used in connection with bids to be opened by the Arsenal for mule saddles, and that the tree is not to be considered as covering all the specifications, concluding: "In the inspection of work the drawings and specifications govern rather than any models or sample." Defendant's witness Hays testified that sample trees were collected from all over the United States for bidding purposes.

In the contract made by the Simmons Hardware Company with the government, dated June 15, 1917, and executed August 10, 1917, covering the subject-matter and the price, it is provided that delivery of the completed saddles should be made at Rock Island, Illinois, not later than November 8, 1917; article 7 of said contract provides that for failure of the contractor to deliver the goods on or before said date a deduction as liquidated damages from the payments shall be made therefor of one-thirtieth of one per cent of the contract price of any material delivered thereafter for each and every day of delay beyond the date stipulated in the contract for the completion of the final delivery of the goods. It should be borne in mind that the Hays Company in April, 1917, entered into its contract with the defendant for the manufacture of the trees, and the contract between Simmons and the government, and in which the delivery date of the saddles to the government is fixed at November 8, 1917, was executed in August of that year.

There is much correspondence in the record between the parties as to the delay in the completion and delivery of the saddletrees by plaintiff. There is evidence that defendant's agent sought to aid plaintiff in getting

foundries in St. Louis to do the work of moulding the horns for the trees; correspondence was introduced to show the commanding officer at Rock Island wrote plaintiff concerning the delay in getting the saddletrees to the defendant, and there is evidence tending to show that because of the delay of plaintiff in sending the saddletrees to defendant, the defendant did not complete its contract with the government until April, 1918. Defendant offered to show by the comptroller of the "George W. Simmons Fund," in which name the bank account of the Saddlery Company was kept, that defendant was penalized to the extent of $3,219.12 by the government for failure to deliver the saddles according to contract before November 8, 1917.

At the outset, counsel for respondent submit that there is no judgment here in favor of the plaintiff on the counterclaim, and that hence no appeal will lie in favor of plaintiff.

Without copying the judgment, same sets out *in haec verba* the peremptory instruction given at the instance of the plaintiff directing a verdict against the defendant and in favor of the plaintiff on the counterclaim; adjudges defendant's counterclaim against the defendant by dismissing the counterclaim; gives judgment for plaintiff for the amount sued for in the petition, and assesses the costs of the suit against defendant. This judgment is sufficient, we think. This is not a case where a nonsuit was taken upon the announcement of the court that it intended to give a demurrer to the evidence where no such instruction was in fact given. Under such circumstances it is a voluntary nonsuit from which no appeal lies. Here an adverse instruction is actually given which finally precludes a recovery on the part of defendant on the counterclaim and exception is taken. Such facts are recited in the judgment itself. We think the judgment is sufficient and that the appeal lies. [Lewis v. Mining Co., 199 Mo. 463, 97 S. W. 938.]

Appellant's complaint goes to the court's action in ruling that as a matter of law defendant's evidence was

not sufficient to take the case to the jury on its counter-claim. Learned counsel for appellant have briefed many points and cite many authorities, the authorities are to the effect that where a party breaches a contract, the other party should receive damages such as may fairly and reasonably be considered either arising naturally, according to the usual course of things, from such breach of contract itself, or such as may reasonably be sup-posed to have been in the contemplation of the parties at the time of making the contract, as the probable re-sult of the breach of it. This rule is taken from the early case of Hadley v. Baxendale, 9 Exchequer Re-ports, 341. All else in the brief faces this proposition of law. This rule is well recognized and is not disputed. The question here is: Did the court err in giving the peremptory instruction on the facts of this record?

We have the rule, then, that the law requires no-tice of special circumstances as might occasion unusual damages to be brought home to a party breaching a con-tract in order to hold such party for special damages. And such knowledge, if brought to the attention of the contracting party is sufficient to warn such party of the special peril which might attend the failure to meet the terms of the contract, and it is not necessary that a statement of such circumstances be contained in the formal contract itself. The special damages must be one which plaintiff from his knowledge of the facts and cir-cumstances, as shown in the evidence, must be held to have anticipated as a natural result of its breach of the contract. This again is found in the authorities cited by appellant. [Wall v. Ice Co., 112 Mo. App. 659, 87 S. W. 574; Iowa Mfg. Co. v. Sturtevant, 162 Fed. 460; Weber Impl. Co. v. Acme Harv. Mach. Co., 268 Mo. 363, l. c. 371, 187 S. W. 874.] It is axiomatic, then, that such notice may be constructive as well as actual.

If there is no evidence in the case tending to show that the plaintiff knew, either actually or constructive ly, that there was a penalty clause, or clause for liqui-

dated damage in the contract of the Simmons Company with the government, or if it was not in some manner brought home to the plaintiff at the time the contract between plaintiff and defendant was entered into that defendant was required in its contract with the government under penalty to complete the saddles on a definite date, to-wit, on or before November 8, 1917—if this completion date was not in the contemplation of the parties at the time—then the lower court correctly ruled the demurrer.

In this connection defendant vigorously complains that it was not permitted to make certain proof; that is, that the court excluded the testimony of witness Spears of a "general custom of the Arsenal and well known to bidders and others having dealings with the Arsenal that contracts let for ordinance supplies contained a provision providing for liquidated damages in case of delay beyond the date of completion provided in the contract." The court also excluded circular No. 84, which was on file at the Arsenal and in use by it, in which circular bidders were advised of the form of contracts required for ordinance supplies. This circular minutely detailed conditions required by the government in such contracts and provides in section 5 (b) that the contracting officer may allow contractor a reasonable time after the date stipulated in the contract for delivery, a final delivery or completion of the work, but that for each day between the stipulated date and that upon which actual delivery is made that 1/30 of 1 per cent of amount of material undelivered, etc., will be deducted from the sum due the contractor.

Conceding, *arguendo*, that a custom is sufficiently pleaded by defendant, and conceding for the present that the court erred in excluding this proffered evidence of a general custom at the Arsenal, did such action constitute harmful error under the facts of this case? We think not. Having the rule in Hadley v. Baxendale in mind, plaintiff can be held to these special damages

213 M. A.—29

(and these damages are highly special), if same naturally and proximately resulted from its breach of contract with defendant. Now it needs no argument to demonstrate that this damage does not naturally and proximately result from such breach. Again, plaintiff would be liable for special damages if same may reasonably be supposed to have been in the contemplation of both plaintiff, Hays Company, and the defendant *at the time* they made their contract as the probable result of a breach thereof.

The offer of proof was of general custom that the government, generally, exacted a time limit, made definite when the contract would be entered into, for the delivery of commodities, and further exacted a penalty for failure to deliver on time. The government's formal contract with Simmons was not executed until August, 1917, though there was an earlier award made in June by letter. No provision for the date of delivery of saddles by Simmons appears anywhere until the formal contract of August was made. The contract between plaintiff and defendant, as already said, was made in April of that year. Can it be said that it was in the contemplation of both parties, plaintiff and defendant, in April, the time of making the contract here involved, that Simmons would be penalized if the saddles were not delivered by *November 8, 1917?* Plaintiff, as a matter of fact, according to the testimony of Hays, never did know until defendant refused to pay plaintiff that there was a penalty clause in the Simmons contract, but certainly plaintiff could not have known in April, 1917, that this date was November 8, 1917, because no date was fixed until August, 1917. Therefore, defendant was not harmed in excluding the proof of the general custom above referred to. Such proof may or may not have been sufficient to charge plaintiff with knowledge of the existence of the custom; it certainly could not have advised plaintiff of the terms of the contract between the government and Simmons, viz., that Simmons would be

penalized from the date of November 8, 1917, if delivery was not then made. Can we say that it can be reasonably supposed to have been in the contemplation of the parties in April that the government would in August fix a date, which would then be set as November 8th, in which the saddle had to be completed? The question answers itself. The date for completion could not in the very nature of things be made known by the law of custom, and a knowledge of such date must be brought home to plaintiff. The date for completion was not a customary date or usual date; it was an arbitrary date fixed by the contracting parties, and indeed was fixed by the Simmons Hardware Company and the government nearly four months after plaintiff accepted the order to make the trees. It may be worthy of note that the plaintiff's contract was not with any party directly having a contract with the government. The government contract was with the Simmons Hardware Company and not the Saddlery Company.

The case of Implement Co. v. Harvesting Co., 268 Mo. 363, 187 S. W. 874, does not, in our opinion, cast the law differently. In that case the sale made by the manufacturer to the jobber involved farm implements— mowing machines. The mowers were for resale for seasonal cropping. Indeed, it was a part of the contract between the manufacturer and the jobber that the jobber could designate the sub-vendees from time to time so that the sale could be consummated by direct delivery from the manufacturer to the farmer, or sub-vendee. The language of Judge BOND on pages 371 and 372 very clearly shows the distinction between the facts of that case and the facts in the case at bar.

We conclude that the evidence on defendant's counterclaim was not sufficient to take the case to the jury, and we are further of the view that the court did not commit reversible error in excluding the evidence above discussed.

Finding no reversible error in the record, the judgment is affirmed. *Allen, P. J.,* and *Becker, J.,* concur.